[Cite as *In re C.W.*, 2020-Ohio-6869.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re C.W., H.W., F.W.

Court of Appeals Nos. L-20-1125
L-20-1129

Trial Court No. JC 19272468

**DECISION AND JUDGMENT**

Decided: December 23, 2020

* * * * *

Laurel A. Kendall, for appellants.

Rebecca L. West-Estell, for appellee.

* * * * *

**MAYLE, J.**

## I. Introduction

{¶ 1} In this consolidated appeal, the appellants, T.W. ("mother") and J.W. ("father"), appeal the July 15, 2020 judgment of the Lucas County Court of Common Pleas, Juvenile Division, terminating their parental rights and granting permanent custody of their children, C.W., H.W., and F.W., to Lucas County Children Services ("LCCS"), the appellee herein. For the following reasons, we affirm.

## II. Background

### A. The family's involvement with LCCS.

{¶ 2} LCCS first became involved with this family in November of 2017 when mother and her three children were living with mother's then-husband, T.P. (hereinafter "stepfather") and his son, B.P. (hereinafter "stepbrother"). The referral involved reports that stepfather "chokes and hits [stepson]" (i.e., his own son) "on the back of the head." In response, "LCCS worked with the family through an alternative response unit." (Complaint at ¶ 5(a)).

{¶ 3} On November 13, 2018, LCCS received a second referral, again with respect to stepbrother, who was alleged to be "hoarding food" at school because he "wasn't eating at home or getting anything to drink" and also because he was "having to care for his younger [step-siblings]." Stepbrother reported that mother (i.e., his stepmother) had called the police on him for "stealing food." An assessments caseworker for LCCS made a visit to the home and met with mom, stepfather, and stepbrother. While investigating the allegations surrounding stepbrother—who is not the subject of this case—the caseworker identified serious concerns about mother's children. At the time, C.W. was six years old. H.W. was four, and F.W. was two.

{¶ 4} On January 2, 2019, another referral was made about a claim of physical abuse sustained by stepbrother. This was considered a "one-hour crisis," causing the assessment caseworker to interview stepbrother and C.W. at school, outside the presence of mother and stepfather. Stepbrother reported that "he hadn't had breakfast or lunch so

2.

he was hungry. So [he] and his [step-siblings] stole some Cheetos, [and] dad whooped him [with] eight hits. And then * * * [mother] came home [and said] 'I didn't see him get whooped.' * * * [so] [stepbrother] was pushed to the floor [and] hit between 12 to 21 times with a belt." The caseworker observed that stepbrother had "a lot of scratches all over his face," a "goose egg on the side of his head [that was] smeared with a little bit of blood," and a "red area on his back and on his butt cheek." C.W. affirmed that stepbrother had been hit with a belt. The assessments caseworker went to the home, and stepfather "admitted to whooping all the children" and that he had gone "overboard." Mother reported that she "was gone" at the time. But, a six-year-old niece, who was visiting, confirmed that, when mother came home, she said, "whip him again because I didn't see it." The caseworker "checked" H.W. and F.W., and she observed that H.W. "had some bruising to her butt area." Mother denied any knowledge of the bruises.

{¶ 5} The caseworker observed that there was "plenty of food in the kitchen" but that there were "a lot of padlocks on the kitchen door." The parents' room and the bathroom were also padlocked. The caseworker testified that mom's "punishment seemed extremely excessive," like punishing H.W., who was four, by requiring her "to sit in a room or bed * * * for four days." Another "example" cited by the caseworker was that when the caseworker "tried to talk to [mom]" about how long stepbrother had been "on his punishment" and "without snacks" and deprived of "his toys," mom responded, "how the hell do you expect me to know?"

3.

{¶ 6} The children reported that their home had mice in it, and that mother used a BB gun to shoot the mice. Mother also "point[ed] [the gun] at the children and their [stepfather]."

{¶ 7} Based upon the above, the caseworker told mother that she "would like" mother to "go ahead" and have a mental health assessment, but mom was "adamant" that an assessment was not necessary because she was already treating with a "psychiatrist," who had prescribed Percocet—for back pain—which, according to mother, he would not do unless she was "mentally stable."

{¶ 8} On January 3, 2019, the children were examined at the agency, before they were placed with foster parents. Melinda Aschliman, R.N. conducted those exams. She described H.W. as having "dirty clothes, dirty underwear, dirty hair," a "fine rash all over her body * * * possibly [from] bug bites, * * * a dark bruise on her center, upper chest * * * bruises on her legs [and] deep layers of a bruise" on her right buttock. H.W. "didn't talk," but stepbrother told the nurse that "she had been spanked." An LCCS supervisor, Amy Cox, assisted with the assessments. She described the girls as "very, very skinny," and that they "smell[ed] [of] urine." Based upon "the yellow hue" of their underwear, "it appeared that there were wearing those underwear for an extended period of time."

**B. LCCS files a complaint, and a case plan is developed.**

{¶ 9} On January 4, 2019, LCCS filed a complaint in dependency, neglect and abuse as to all three children and a motion to place the children into shelter care. In addition to the allegations raised above, the complaint also alleged that the children's

4.

father was J.W. ("father"), that mother and father had a history of domestic violence between them, that father lived in Kentucky, and that efforts by LCCS to contact him were unsuccessful. After a hearing that same day before a magistrate, LCCS was granted interim, temporary custody of C.W., H.W., and F.W.

{¶ 10} An adjudicatory hearing was held on March 12, 2019. The purpose of an adjudicatory hearing is "to determine whether a child is * * * abused, neglected, or dependent or is otherwise within the jurisdiction of the court." Juv.R. 2(B). Mother and father attended the hearing and consented to a finding of abuse, neglect and dependency. At the conclusion of the hearing, LCCS was granted temporary custody.

{¶ 11} A case plan was developed that ordered mother to attend parenting classes and to complete a dual assessment. Months later, in October of 2019, the case plan was amended to include trauma and domestic violence therapy, following an incident of domestic violence between mother and stepfather. The case plan also provided for supervised, Level 1 visitation (the most restrictive) at LCCS for both parents. Finally, the case plan ordered trauma counseling for C.W. and developmental assessments for H.W. and F.W. Separately, a dual assessment and parenting classes were ordered as to father.

## C. LCCS moves for permanent custody, and a trial is held.

{¶ 12} On March 11, 2020, LCCS filed a motion for permanent custody. A three-day trial was held, beginning on June 22, 2020. In all, 12 witnesses testified: an LCCS assessment caseworker (Barb Cummins), C.W.'s therapist (Sandra Pessefall), H.W. and F.W.'s therapist (Dena Shafer, LISW), a child abuse expert (Randall Schlievert, M.D.),

5.

an LCCS supervisor (Amy Cox), the foster-father (Ju.P.), the foster-mother (Je.P.), an LCCS nurse (Melinda Aschliman, R.N.), the LCCS caseworker (Cherese Mitchell-El), mother, and the GAL (Sharon Fitzgerald).

{¶ 13} LCCS assessment caseworker Barb Cummins testified that, although this case began with allegations of physical abuse, the agency suspected that the children had also been abused sexually, based upon reports by the children that surfaced in April of 2020. At that time, "C.W. [began] talking about having to sleep naked with his mother in bed, that his mother was touching his penis, that he had to take cold showers with her. That he would urinate on the bathroom wall and she would lick if off. Information about seeing [mother] and [stepfather] having sex, doing what dogs do. Imitating the noises they make in their sexual encounter." Cummins did not have to "pry anything out of C.W."; rather, he "spit out" what had "happened" and was "adamant" that it had occurred. C.W. disclosed much of the abuse by writing letters, which he asked Cummins to give to "the judge." H.W. also disclosed that mother and stepfather "had touched her vagina." Cummins concluded that the children had "been exposed to something sexual * * * because the [two older children], especially [C.W.] were descriptive [as to] * * * what was going in where." She believes that "they [were] exposed to a lot of sexual abuse," and she added that each was "very afraid of going home."

{¶ 14} As a result of the sex abuse claims, LCCS referred the children to Dr. Schlievert who interviewed and assessed the children for "possible sexual abuse." While Dr. Schlievert had "concerns," he concluded that there was not enough "information that

6.

was conveyed to [him] directly by the children" to make a finding that sexual abuse had occurred in this case.

## The children's therapists

{¶ 15} Sandra Pessefall is C.W.'s therapist, who met with C.W. at least 70 times by the time of trial. Pessefall diagnosed C.W. with post-traumatic stress disorder as a result of witnessing domestic violence between stepfather and mother and from being physically and sexually abused by them. According to her, C.W. "consistently" reported that he did not want to "have anything to do with his biological mother," due to his "deep seeded fear" of her. In March of 2020, Pessefall wrote the caseworker to recommend that visitation, even by video, be stopped because each visit with mother was a "set back" for C.W. and "re-traumatized him." She added that the video visits were, in some ways, worse than the in-person visits because they "brought [mother] into his safe place. He feels safe in the foster home. * * * [H]aving her there made it so that he didn't feel that safe anymore." Pessefall testified that C.W. "really started opening up more once the visitations stopped" in the spring of 2020. Pessefall opined that although the trauma therapy is helping C.W., he will likely need "to work" on his mental health for "the rest of his life."

{¶ 16} Next, Dena Shafer testified. Ms. Shafer conducted "play therapy" with H.W. and F.W., beginning in July of 2019. As a result of that therapy, she diagnosed "unspecified trauma related disorder" as to both girls and a speech delay, as to H.W. In sessions, H.W. displayed "aggressive behavior." Shafer opined that H.W. lacks an

7.

emotional bond with mother, and she "ignore[d]" questions about father or responded that she "didn't want to talk" about him. Although younger, F.W. was "more verbal" than H.W. She told Shafer that mother "bite my vagina" [sic], and when asked if she wanted to visit with mother, F.W. responded, "No, her hurt me." [Sic]. Like her siblings, F.W. did not appear to have a bond with either parent.

{¶ 17} Shafer also recommended that visits between the girls and mother cease because "their anxiety would increase before and after visits" causing "bedwetting, diarrhea [and] aggressive behaviors." Those behaviors decreased, though not entirely, once the visits were halted.

### The foster parents

{¶ 18} The children were placed in the foster home on the evening of January 3, 2019, and remained there, 18 months later, when the hearing occurred.

{¶ 19} According to the foster parents, C.W. "didn't really talk a lot" when he arrived and they described him as "zombie-like for quite a while." In consultation with C.W.'s physician, he was "taken off" a medication used to treat ADHD, and became a "totally different kid. Spunky, perky, happy, just wanted to play with everybody. He loves to be outside. Just night and day difference." Over time, C.W. has also "open[ed] up" and become "more talkative." When the visits with mother were in person, "a pattern developed" whereby C.W. would misbehave in school and go into "panic mode" as they drove from their home to the location of the visits. After the visits, C.W. would wet the bed, have temper tantrums and "zone out." C.W. was given a notebook to write

8.

down "his thoughts and feelings," and he wrote frequent notes to the caseworker, the court, his foster parents and the GAL, stating that he did not want to go on any more visits. In those notes, he also described the abuse he sustained. Foster father testified that C.W. wrote of "not being fed, being kept in a room, locked in a room. Having to bang on walls to be heard." He also disclosed that mother "touched his penis and his butt," that he was "handcuffed" to stepbrother and forced to watch his sisters eat McDonalds while the boys were denied food, that he was "whooped with a belt," that stepfather "punched him in the face" and threw a television at mother. In April of 2020, C.W. divulged "sexual-type things" to foster mother, including that mother had "put her finger in [C.W.'s] butt." Foster mother reported the abuse to C.W.'s therapist.

{¶ 20} Foster father testified that C.W. is "very into sports now," especially soccer. Foster father taught him how to play baseball, and their time together is either "sports related" or "just talking [about how to] be a good, solid man."

{¶ 21} When H.W arrived, she was "very timid" and her speech was "barely understand[able]." She used inappropriate language, calling foster mother a "yucky bitch." F.W., who was two years old, "called everybody in [the] house a bitch constantly." Both used to "scream" at bath time because they assumed that the bath would be filled with cold water. And, "both of the girls from the beginning were adamant that someone had touched their vagina without using exact terms" according to foster mother. H.W. also reported physical abuse that was similar to the claims alleged by C.W.

9.

{¶ 22} When H.W., who was four years old, arrived she "didn't speak," and it was thought that she had "selective mutism." "[T]o this day," [when] confronted with anything at all, [like forgetting to flush the toilet], she freezes and won't speak." Within a couple of days of her placement, however, H.W. "really loosened up" and began to "laugh and smile." Foster father said it has been "incredible" to witness her improvement. He described her as "real friendly [and] fun loving" girl who loves pageants and cheerleading. She was "very proud" to have earned "first place" in their town's Christmas pageant.

{¶ 23} The foster parents described F.W. as a "spitfire" who "wants to do everything that her big sister does." They allowed her to play T-ball but are "making her wait a little bit [to participate in cheerleading] until [she gets] better with listening." F.W. told her foster parents that she is "scared" of mother. Although she does not have a lot of "memory of the physical abuse," she "seems to recall * * * the belt" and "being whooped." And "she walked around the longest time saying [mother] bite my vagina."

{¶ 24} Foster mother described similar acting out by the girls around the time of visits, including fits of "screaming and crying" and "bedwetting" and "diarrhea" and "nightmares." She testified that the children "never wanted to visit" mother, and she could only recall the children visiting with father "two, maybe three" times.

{¶ 25} Although the foster parents have had other foster children in their home, this was their "first kind of permanent placement" and they "would" be interested in adopting them. Their "biggest concern is * * * that [the children are] safe."

10.

## The LCCS caseworker

{¶ 26} The caseworker testified that, as part of its investigation, LCCS learned that mother sustained "a lot of trauma during her [own] childhood," including claims that "there was no food in the [mother's childhood] home [and] cupboards were locked."

{¶ 27} With regard to the case plan, the caseworker testified that mother completed the dual assessment and later, trauma counseling with her own provider, who, while not a "psychiatrist," was qualified to provide trauma counseling. The caseworker described mother's participation in parenting classes as "consistent" and that she "completed the class successfully." As to domestic violence therapy, mother initially resisted it on the basis that she was no longer living with either abuser, i.e., father or stepfather. Ultimately, however, mother began the classes, then took a six-month hiatus, before re-engaging and "substantially completing" the course. Despite her near-total completion of the coursework identified in her case plan, LCCS was not satisfied with mother's progress because she "never did take any * * * responsibility" for the harm done to the children. Instead, as to each and every claim, mother either denied any knowledge of it, said her kids were lying or "being coached," or blamed stepfather for her "situation."

{¶ 28} As for father, the caseworker offered to arrange a home-study in Kentucky after father expressed his intention "to get the kids to take them back [there]." Kentucky denied the request for an "interstate compact placement" due to father's lack of adequate

housing and employment and because "he hadn't completed a dual diagnostic assessment and parenting classes as requested of him by the state of Ohio."

{¶ 29} In all, father visited with the children two or three times, the last of which occurred in October of 2019. In December of 2019, the caseworker learned—from his mother—that father was "homeless" and that his "phone was off," and she encouraged him to call her so she could "help him." Father called the caseworker in March of 2020. At that time, father reported that he was living in Perrysburg, Ohio, with a friend, who was reportedly a convicted sex offender. Father told the caseworker that he left Kentucky after his girlfriend (and mother to his new baby) reported him for domestic violence. When told that LCCS was seeking permanent custody, father told the caseworker that he had always "suspected sexual abuse," but had not reported it to anyone. Father did not ask to see the children.

{¶ 30} As a result of his dual assessment, father was diagnosed with anxiety and depression. Although he attended some counseling sessions, he failed to re-engage after the pandemic began, despite being provided with a tablet from the provider so that sessions could continue. Father told the caseworker that "he just hadn't set it up yet." Father never enrolled in parenting classes.

{¶ 31} The caseworker testified that it would be in the children's best interest if the agency was awarded permanent custody because the children, even a year-and-one-half later, remain "traumatized [by] the abuse." In the caseworker's experience, "kids * * * want to go back home to their parents, even if the abuse was bad." But, she added,

12.

"I never had a case like this where children have sustained so much abuse and then they say they don't want to go home. This is actually my first."

**Mother**

{¶ 32} Mother's refusal to accept responsibility was on full display at the hearing. For example, when asked if she "realized that waiting that six months [to re-engage in domestic violence services] prolonged [her] reunification with her children," mother responded, "that's not my fault." When asked if her "thinking" had changed with regard to padlocks—in light of her parenting classes—mother answered, "Yes. I have alarms on all the doors now. No more locks. Just alarms." Mother denied that the children ever witnessed her shooting mice because they were "asleep in bed when [she] shot the mice." Besides, she said, "[i]t was a little BB gun. It was not going to hurt them at all." She volunteered that she taught her "6 year old * * * how to work the gun [safely] * * * which is not against the law." Mother described her children as "gullible," and said she was not surprised that they no longer wanted to visit with her after "living in this rich girl's home who tells them things." Finally, as to all the evidence of abuse in this case, mother would only acknowledge a single incident and that was to stepbrother, at the hands of stepfather. Mother said that her "whole screw up in all of this is that I was trying to take care of a kid that wasn't mine."

{¶ 33} Mother was willing to admit that her own experience in foster care was bad, and because of it, she "hate[s]" her own mother "for what she [did]" like "beating

the shit out of [her] all the time [and] selling [her] out [and] not taking care of her." But, she added that she does not "let that stuff bother her now [because] [l]ife is too short."

### The guardian ad litem

{¶ 34} The children's guardian ad litem and attorney was appointed by the court on January 9, 2019. She conducted an independent investigation in this case and authored a report dated June 22, 2020. Throughout the course of the case, the GAL observed five or six visits, met the children about twelve times, and spoke with the caseworkers, therapists, mother, father, foster parents, visitation "guards" and two parenting instructors.

{¶ 35} The GAL recommended that it was in the best interests of the children that LCCS be awarded permanent custody. She explained that, although the parents had been "offered all kinds of services," neither "learned to look at their [own] trauma" or recognize that the cycle of abuse was continuing in the lives of their children.

{¶ 36} The GAL found the children's reports of sexual abuse (against mother) and physical abuse (against mother and stepfather) credible because the "kinds of things" the children discussed were "so far beyond their developmental imagination [that] they must have experienced at least some of it." The GAL criticized mother's refusal to take responsibility for "what happened in the home," noting that "[a]t the very least," she knew stepfather was violent because she experienced it firsthand when he put her in the hospital with a "dislocated foot." And, she questioned mother's denial that mother did

14.

not observe bruising on her children, "given the number of times the kids talked about not having any clothes on in the house."

{¶ 37} As for dad, it was the GAL's "impression that he * * * left his children behind a long time ago." In the beginning, when dad lived in Kentucky, the GAL thought that he was "committed," and she "did her darnedest" to "get the funding for him" to obtain services there and to help him travel back and forth. But then he just "stopped" communicating with her over the course of nine months. The GAL learned later that dad "was up here with his ex-wife (i.e., mother) for a couple of weeks" but failed to let anyone know so that visits could be "set up * * * with the kids." By the GAL's "calculations, he only visited for two hours with his children since the case was opened." She observed one of those visits and described his behavior as appropriate and that he "seemed comfortable" with them. The GAL described dad as "living * * * parallel," to this case and noted that he was "not even asking to have the children."

{¶ 38} Finally, the GAL opined that it would be "devastating" for the children if they were returned to mother's care, based upon their "demonstrated anxiety, terror, sadness, fear and physical manifestation of all those things." She added that, "seeing how much they don't want to go [to mother's] home, a ruling for them to go home I think would be catastrophic, especially for [C.W.]." In her 35 years of doing guardian ad litem work, the GAL testified that this case ranked "among the worst just from the intensity of the children's disclosures."

15.

## D. The court grants LCCS's motion.

{¶ 39} On July 15, 2020, the trial court granted LCCS's motion, terminating mother and father's parental rights and awarding permanent custody of C.W., H.W. and F.W. to LCCS. The parents appealed and assigned the following errors for our review:

> I. The evidence supporting the trial court's finding that the minor children here could not be returned to their mother was not clear and convincing when she had substantially completed her case plan services, and had visited regularly with the children, and when time remained in the case.

> II. The evidence supporting the trial court's finding that the minor children here could not be returned to their father was not clear and convincing with [sic] he had engaged in case plan services; when his interactions with the children were considered appropriate; and when time remained on the case.

## III. Law and Analysis

{¶ 40} R.C. 2151.414 sets forth "specific findings a juvenile court must make before granting an agency's motion for permanent custody of a child." *In re A.M.,* Slip Opinion No. 2020-Ohio-5102, ¶ 18, citing *In re C.F.,* 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 22. As relevant here, the court must find by clear and convincing evidence "(1) that one or more of the conditions in R.C. 2151.414(B)(1)(a)

16.

through (e) applies and (2) that a grant of permanent custody is in the child's best interest. R.C. 2151.414(B)(1)." *Id.*

{¶ 41} R.C. 2151.414(B)(1)(a) requires a finding that the child has not been abandoned or orphaned, has not been in the custody of a public children services agency or a private child placing agency for at least 12 months of a consecutive 22-month period, and cannot be placed with either parent within a reasonable time or should not be placed with either parent; subsection (b) requires a finding that the child is abandoned; subsection (c) requires a finding that the child is orphaned and there are no relatives who are able to take permanent custody; subsection (d) requires a finding that the child has been in the temporary custody of a public children services agency or a private child placing agency for at least 12 months of a consecutive 22-month period; and subsection (e) requires a finding that the child or another child the parent had custody of has been adjudicated abused, neglected, or dependent on three separate occasions.

{¶ 42} Here, the juvenile court determined that R.C. 2151.414(B)(1)(a) applies to the facts of this case. Therefore, the court was required to consider whether granting permanent custody to the agency is in the child's best interest *and* whether any of the factors enumerated in R.C. 2151.414(E) are present that would indicate that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. *In re B.K.*, 6th Dist. Lucas No. L-10-1053, 2010-Ohio-3329, ¶ 42-43. On appeal, mother and father challenge the juvenile court's findings with respect to Section (E), i.e., that the children should not, and could not within a reasonable time, be placed

17.

with either parent. They do not challenge the trial court's finding that a grant of permanent custody to the department was in the children's best interest. Therefore, we confine this decision to the juvenile court's determination that, under R.C. 2151.414(B)(1)(a), the children should not, and could not within a reasonable time, be placed with either parent. *Accord In re A.M.* at ¶ 18.

{¶ 43} We review a trial court's determination in a permanent custody case under a manifest-weight-of-the-evidence standard. *In re P.W.*, 6th Dist. Lucas No. L-12-1060, 2012-Ohio-3556, ¶ 20. In doing so, we must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the decision must be reversed. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). But, while we review the evidence and consider the witnesses' credibility, we must be mindful that the juvenile court, as the trier of fact, is in the best position to weigh evidence and evaluate testimony. *In re. P.W.* at ¶ 20. Its discretion in determining whether an order of permanent custody is in the best interest of a child "should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." (Internal citations omitted.) *In re C.P.*, 10th Dist. Franklin No. 08AP-1128, 2009-Ohio-2760, ¶ 10.

{¶ 44} In its decision, because the court found that R.C. 2151.414(B)(1)(a) applies, it examined the R.C. 2151.414(E) factors. A court need only find one (E) factor

18.

present to support a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. *In re C.F.* at ¶ 50, citing *In re William S.*, 75 Ohio St.3d 95, 661 N.E.2d 738 (1996), syllabus.

{¶ 45} The court found that Sections (E)(1), (2) and (4) applied to both mother and father. It found that Section (E)(10) also applied as to father. Those sections provide,

(E) In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be

19.

placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

(2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;

\* \* \*

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;

\* \* \*

(10) The parent has abandoned the child.

{¶ 46} All of the court's findings under R.C. 2151.414 must be by clear and convincing evidence. "Clear and convincing evidence" is evidence sufficient for the trier of fact to form a firm conviction or belief that the essential statutory elements for a termination of parental rights have been established. *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus; *In re Tashayla S.*, 6th Dist. Lucas No. L-03-1253, 2004-Ohio-896, ¶ 14.

**A. The evidence supports the trial court's finding that the children could not be returned to the mother's care within a reasonable time or should not be returned.**

{¶ 47} As to Section (E)(1), the court found that "despite substantially completing case plan services, Mother lacks the ability or has failed to make significant progress in the services to return the children to her and to keep the children safe and heathy." Based upon her testimony at trial, the court concluded that mother "lacks insight in the circumstances she and her children were living in" including her use of locks in the home, "shooting mice with a BB gun in the presence of children" and claiming there were "no bruises on the children despite being presented with evidence to the contrary."

{¶ 48} In appellants' first assignment of error, mother does not challenge any particular Section (E) finding by the court. Instead, she claims that, because parents are allowed "up to [24 months] to complete case plan services, * * * this court should find that approximately six months remained available" to her—as of the time of trial—to complete her case plan. And, she claims that "arguably * * * additional time would be

21.

helpful to her." We interpret mother's claim as a challenge to the trial court's finding under Section (E)(1). And, we find it not well-taken.

{¶ 49} Mother's testimony at trial firmly established that, despite more than 18 months of services, she remained steadfast in her unwillingness or inability to accept any responsibility for the conditions that led to the children's removal. If anything, mother doubled down, insisting that the agency's concerns were unfounded. When asked whether her "thinking" on the use of padlocks had changed in light of parenting classes, mother answered, "Yes. I have alarms on all the doors now. No more locks. Just alarms." Mother rationalized the use of shooting "a little BB gun" in the house while the children were "sleeping," only then to announce that she had "legally" taught her "6 year old" to operate a "gun."

{¶ 50} Mother also appears to challenge the trial court's finding—that the children could not and should not be returned to her mother's care within a reasonable time—by pointing to "evidence" that she "wasn't questioned" about sexual abuse and was "unaware" of stepbrother's beating. First, evidence was presented from multiple sources that mother witnessed and even encouraged stepbrother's beating. But, what speaks volumes to this court is the total absence that mother ever, in the 18 months after the children were removed, acknowledged the harm that was done to the children, if only physically and emotionally, irrespective of the cause. At the time of their removal, the children were described as dirty, very skinny, bruised, traumatized, mute, aggressive, zombie-like, and profane. As expressed by the GAL, mother simply lacks, then and now,

22.

any understanding of "what kind of shape the kids [were] in," and "if [mother] doesn't understand it, she can't do anything about it." A parent "is afforded a reasonable, not an indefinite, period of time to remedy the conditions causing the children's removal." *In re A.L.A. and A.S.A.*, 11th Dist. Lake Nos. 2011-L-020 and 2011-L-021, 2011-Ohio-3124, ¶ 108. (Finding that mother was not entitled to more than the 18 months that had elapsed since the case plan in that case was filed.) We see no evidence to support mother's claim that an additional six months of services would make any difference in her ability to provide a safe and loving home to these children. In sum, the record contains clear and convincing evidence to support the trial court's finding under Section (E)(1) that, despite mother's substantial completion of her case plan, she failed continuously and substantially to remedy the conditions that caused the children's removal.

{¶ 51} As to Section (E)(2), the court found that mother has been in mental health counseling for a "substantial period of time yet has made very little progress." The court noted that "many of the actions [mother] took towards the children [that were considered inappropriate] were taken towards her by her own mother yet she fails to acknowledge the gravity of these actions." The court concluded that, "Mother lacks insight into how her past trauma has affected the way she parents toward the children."

{¶ 52} Mother does not address the trial court's finding under Section (E)(2), nor does she address the trial court's specific conclusion that "her past trauma" affects the way she parents. Based upon our review of the record, mother sustained terrible abuse herself as a young person, and perhaps understandably, "hates" her mother for it. But,

23.

the record contains no evidence to suggest that mother's treatment for trauma has had any measurable impact on her psychological well-being. Merely completing the coursework and professing that she does not "let that stuff bother her" does not cast doubt on the trial court's finding that mother remains severely impacted by unresolved trauma.

{¶ 53} Finally, as to Section (E)(4), the court found that mother "failed to demonstrate an ability to maintain control of the children during visits. Mother's testimony regarding visits was contrary to others who have observed the visits."

{¶ 54} The evidence at trial established that mother attended "99%" of the visits. On appeal, mother asserts that her attendance and her "diligence" in following recommendations, "particularly [in] regards [to] bringing food for the visits" demonstrate her ability to care for the children.

{¶ 55} Actually, the record indicates that mother was asked to *discontinue* bringing food to the visits because it was so disruptive. The GAL testified extensively about the visits between mother and the children. In short, they were "so bad" that the GAL requested that they be suspended. Many factors influenced the GAL, including the fact that before, during and after the visits, the "kids bodies rebel[led]." She elaborated that there was "just so much peeing and pooping going on and throwing up, * * * in reaction" to visiting with mother. Also, before entering the visitation room, the kids would "cling[] to all sorts of personnel, whether it was security guards or foster mom or foster dad or visitation people." Once inside the visitation room, the girls "lost control" by climbing onto furniture, making a mess with food, and repeatedly running into the

24.

hallway and eluding the security guards who ran after them. While C.W. would "behave himself and cooperate," mom "basically ignored" him, while the girls "rais[ed] havoc" and "evolved into this wildness." The GAL described mom as "very rigid" who "would lecture" the girls, but "nothing seemed to work." Of particular relevance to the trial court's finding under Section (E)(4), the GAL testified that the girls would typically use the bathroom "three or four times" per visit, and initially, mother was allowed to take them. However, after a report that she had "hurt their vagina" while in the LCCS bathroom, the agency prohibited mother from taking them anymore. After another visit and report, "the kids were no longer allowed to sit on mom's lap."

{¶ 56} In sum, we find that competent, credible evidence supports the trial court's finding under R.C. 2151.414(E)(1), (2) and (4) as to mother. Therefore, we find that the trial court did not err in finding that the children could not be placed with mother within a reasonable time or should not be placed with her. Accordingly, the first assignment of error is found not well-taken.

**B. The evidence supports the trial court's finding that the children could not be returned to the father's care within a reasonable time or should not be returned.**

{¶ 57} Here, the juvenile court found that father "has abandoned the children in that he has not visited with the children in over [18] months nor has he asked to visit with them" under R.C. 2151.414(E)(10).

{¶ 58} Under R.C. 2151.011(C), "a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than

25.

ninety days, regardless of whether the parents resume contact with the child after that period of ninety days." Here, father admits that he only attended two or three visits at LCCS, the last of which occurred in October of 2019. Thus, he had no contact with the children for at least seven months prior to the permanent custody hearing in this case. During some of that time, at least, he was back in Ohio but failed to communicate with the caseworker or GAL. Most notably, when he did finally contact the caseworker, he did not ask to visit with the children. We find that clear and convincing evidence supports the juvenile court's determination that father abandoned the children under R.C. 2151.414(E)(10). *Accord In re. M.G.*, 6th Dist. Lucas Nos. L-20-1114, L-20-1115, 2020-Ohio-5288, ¶ 41.

{¶ 59} The trial court also found that the children could not or should not be placed with father under Sections (E)(1), (2), and (4), and father does not challenge the court's findings under those sections. To the contrary, he specifically admits that "he did not engage in a parenting program" and lacks "stable housing," which supports the trial court's finding, under Section (E)(1), i.e., that father "has failed to complete case plan services and has stated to more than one person that he is not in a position to take custody of the children." Also, and as discussed above, he agrees that he "only visited with the children three times and has not visited with them since October of 2019" which supports the trial court finding under Section (E)(4). And finally, while he maintains that he "engaged" in mental health treatment at Harbor, he does not challenge the trial court's

finding under Section (E)(2) that, "[a]lthough father has engaged in mental health counseling, he has been sporadic in his compliance."

{¶ 60} The only argument raised by father is that—like mother—he is entitled to an additional six months to "re-establish visits" and complete a parenting class. Father's aspirational claim falls flat, in light of the record evidence establishing that he never asked to see his children, lost contact with the agency, did not testify at the hearing, and admitted that he was not in a position to care for the children. For these reasons, we find the second assignment of error not well-taken.

{¶ 61} We find that clear and convincing evidence supports the juvenile court's determination under R.C. 2151.414(B)(1)(a) that C.W., H.W., and F.W. could not be returned to mother or father within a reasonable time or should not be returned to mother or father. Therefore, we find that the juvenile court's award of permanent custody to LCCS in this case was not against the manifest weight of the evidence. Accordingly, the appellants' assignments of error are not well-taken.

### IV. Conclusion

{¶ 62} For the reasons expressed above, we find that the trial court's decision was supported by clear and convincing evidence and was not against the manifest weight of the evidence. We find that the appellants' assignments of error are without merit. Therefore, the July 15, 2020 judgment of the Lucas County Court of Common Pleas,

27.

Juvenile Division, is affirmed.  Pursuant to App.R. 24, costs of this appeal are assessed to mother and father, to be shared equally.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.         

_____
JUDGE

Thomas J. Osowik, J.      

_____
JUDGE

Christine E. Mayle, J.     
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.